[Civ. No. 19812. Third Dist. July 22, 1981.]

SILVIO MARGULIS, Plaintiff and Appellant, v.
BEVERLEE MYERS, as Director, etc., Defendant and Respondent.

COUNSEL

Charles G. Stein for Plaintiff and Appellant.

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, and Elisabeth C. Brandt, Deputy Attorney General, for Defendant and Respondent.

OPINION

CARR, J.—Plaintiff appeals from a judgment denying mandate and dismissing a complaint which alleged violation of civil rights. The issue before us is whether a physician participating in the Medi-Cal program has a right to a hearing before being subjected to an order by the Direc-

tor of the Department of Health Services requiring him to obtain authorization prior to providing Medi-Cal services.[1]

Appellant, Dr. Silvio Margulis, is a pediatrician who has practiced in the Mission District of San Francisco for over 15 years. Since March 1, 1966, he has participated in the California Medical Assistance Program (Medi-Cal) as a physician provider within the meaning of title 22, California Administrative Code, section 51454. More than 90 percent of his practice consists of Medi-Cal patients. Although he maintains regular office hours, the majority of claims submitted to the Department of Health Services were for house calls occurring primarily in the evenings and on weekends.

During June 1977, a team from the Surveillance and Utilization Review (SUR) Unit[2] conducted an onsite review of his practice. His records disclosed he had provided the services for which he had billed, but the Department of Health Services determined he should not be allowed a surcharge for after-hours services since his regular working hours were evenings and weekends. A surcharge is usually permitted for services outside customary business hours (Cal. Admin. Code, tit. 22, § 51503, subd. (e)) and for house calls. He was further limited to a single home-visit surcharge per family when visiting more than one family member at one time. Instructions embodying these restrictions were given to the fiscal intermediary, Medi-Cal Intermediary Operations (MIO). Subsequently, MIO was instructed to place the doctor on full prospective review, so that all of his claims would be reviewed for appropriateness and medical necessity. Dr. Margulis objected to this procedure.[3]

On February 8, 1979, the SUR Unit again reviewed appellant's Medi-Cal practice. MIO presented to SUR a package of claims which

---

[1]Plaintiff filed in superior court a petition for writ of mandate (Code Civ. Proc., § 1085) and a complaint for violation of civil rights (42 U.S.C. § 1983). By his petition for writ of mandate he sought to compel the Director of Health Services to rescind her order placing him on prior authorization and to provide an evidentiary hearing before requiring prior authorization. The civil rights complaint alleged money damages for loss of income and physical and mental suffering.

[2]The SUR was established pursuant to a federal requirement that states provide methods and procedures to safeguard against unnecessary utilization of care and services. (42 C.F.R. § 456.1. See discussion, *infra*.)

[3]This postservice prepayment audit is known as special prepayment evaluation and review (SPEAR) and is a utilization control authorized by section 14133 of the Welfare and Institutions Code.

appeared to be problematic because numerous claims were for persons of the same surname and several series of claims represented services rendered weekly or two or three times a month to the same individual over a two-year period. It was further noted that the diagnoses for these repeated visits appeared as stereotypical repetitions of essentially synonomous terms, such as "rhinopharyngotracheitis" and "rhinopharyngolaryngitis" which, according to testimony, refer to a common cold. The analysis also disclosed an increase in the frequency of claims submitted for a particular individual for the same apparent diagnosis.

Between February 8, 1979, and May 4, 1979, two physicians participated with SUR in an extensive analysis of the Medi-Cal claims submitted by Dr. Margulis. On May 4, 1979, SUR conducted a case review at which Paul Keller, the head of the SUR Unit, concurred in the recommendation of the San Francisco SUR section that Dr. Margulis should be placed on prior authorization. One of the reviewing physicians, Dr. Neal, characterized appellant's practice as "so deviant" that further review of his office files was unnecessary.

Prior authorization was recommended because it would permit appellant to continue practicing and providing necessary services and emergency care while protecting Medi-Cal from making payments for unnecessary services.

Paul Keller instructed John Kelly, head of the San Francisco SUR section, to draft a letter implementing the policy of prior authorization. The draft letter was reviewed by Keller and by the chief medical consultant to SUR, Dr. Rosen. Finally, Keller presented the letter to respondent Beverlee Myers for her signature, after explaining the circumstances of the case to Ms. Myers. She signed the letter and it was sent to appellant.

Effective August 15, 1979, appellant was required to prospectively (or in some cases, retroactively)[4] submit a treatment authorization request (TAR) for each service treatment, and await approval by a Medi-Cal physician-consultant before payment could be obtained.

---

[4]Emergency services require no prior authorization. Also, if service must be rendered more quickly than a written request will permit, a telephone request prior to 4:30 p.m. of the day of the service is acceptable. If telephone contact is not possible and a patient needs immediate care, retroactive authorization may be obtained. (Cal. Admin. Code, tit. 22, § 51003, subd. (b)(3).) A continued course of treatment may require only one authorization. (Cal. Admin. Code, tit. 22, § 51003, subd. (e).)

Appellant submitted no TARs for approval believing to do so would have been futile. He continued seeing patients and submitting bills, which were returned unpaid because no prior authorization had been obtained. He was informed that he could appeal the denial of any claim pursuant to the grievance procedure found in section 51015. (Cal. Admin. Code, tit. 22.)

We first review the pertinent law. The Social Security Act requires that participating states "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization . . . of care and services. . . ." (42 U.S.C. § 1396(a)(30).) Pertinent federal implementing regulations provide that "The Medicaid agency must create a statewide surveillance and utilization control program that—

"(a) Safeguards against unnecessary or inappropriate use of Medicaid services and against excess payments;

"(b) Assessess the quality of those services;

"(c) Provides for the control of the utilization of all services provided under the plan in accordance with Subpart B of this part; . . ." (42 C.F.R. § 456.3.)

States are also required to "have a postpayment review process that—"(a) Allows State personnel to develop and review—(1) Recipient utilization profiles; (2) Provider service profiles; and (3) Exceptions criteria; and

"(b) Identifies exceptions so that the agency can correct misutilization practices of recipients and providers." (42 C.F.R. § 456.23.)

In response to the federal requirements, California has created SUR which operates pursuant to certain provisions of the Welfare and Institutions Code and title 22 of the California Administrative Code.

Section 14133 of the Welfare and Institutions Code authorizes the following utilization controls: prior authorization; postservice prepayment audit; postservice postpayment audit; limitation on number of services; review of services by Professional Standards Review Organization. Title 22 specifies certain services which are always subject to prior

authorization, e.g.: nonemergency hospitalization (§ 51327, subd. (a)(2)); nursing home care (§§ 51334 and 51335); specialized rehabilitative services (§ 51336, subd. (a)(2)). Ordinarily a physician need not obtain prior authorization unless required to do so by Health Services pursuant to Welfare and Institutions Code, section 14103.6, which provides in pertinent part: "The director, or a carrier acting under regulations adopted by the director, may require that any individual provider must receive prior authorization before providing services when the director or carrier determines that the provider has been rendering unnecessary services.... [¶] In no event shall prior authorization be required when there is a bona fide emergency requiring immediate treatment."

 Although there is no state or federal statute or regulation which specifically requires the state agency to afford providers of services a hearing before implementing a policy of prior authorization, appellant cites section 455.13 of the Code of Federal Regulations as mandating a hearing. That section is one of several pertaining to establishment of a fraud detection and investigation program, as required of participating states by the federal government[5] and provides that the state must establish: "(a) Methods and criteria for identifying suspected fraud cases;

"(b) Methods for investigating these cases that—(1) Do not infringe on the legal rights of persons involved; and (2) Afford due process of law; and

"(c) Procedures, developed in cooperation with State legal authorities, for referring suspected fraud cases to law enforcement officials...."

Appellant's suggestion that section 455.13 pertains to the utilization control function of SUR is incorrect. SUR was created in response to Code of Federal Regulations, section 456.1 et seq., which pertains to utilization control, not the detection of fraud which is the focus of section 455.13. Pursuant to section 456.1, a state is required to "provide methods and procedures to safeguard against *unnecessary utilization* of care and services." (Italics added.)

Appellant asserts "Prior authorization is a utilization control—a sanction which has the purpose of controlling 'excess services' and other

---

[5]The definition of *fraud* is determined according to state law. (42 C.F.R. § 455.11.)

*abuses* of the Program. [¶] If a prerequisite to its imposition is a finding of abuse, then it follows that the abuser is dishonest; that he is trying to 'gouge' the State. That is a direct reflection on the provider's honesty and integrity. [¶] If such dishonesty is found, the proper remedy is *suspension* from the Program. But it is *admitted* by Appellee that *no* charges of dishonesty or wrong-doing are made by the Department. If there is no wrong-doing, then why is the sanction necessary?"

The short answer to appellant's rhetorical question is that the requirement of prior authorization is not a sanction. There has been no determination, expressly or impliedly, that appellant is dishonest or trying to "gouge" the state.

In accordance with its federally derived mandate, SUR reviewed services rendered by appellant and concluded that many were "unnecessary," which implies only that appellant's concept of what is "necessary" differs from that of the department. Although prior authorization inconveniences appellant it is applied not as a penalty, but as a means by which the department ensures that only necessary services are provided. Less restrictive alternatives had failed to achieve that result. Appellant has been neither suspended nor dismissed from participation in the Medi-Cal program.

Nevertheless, appellant contends the requirement of prior authorization effectively deprives him of a "property" interest without a hearing, thereby violating his constitutional right to due process. He relies primarily upon such cases as *Perry* v. *Sinderman* (1972) 408 U.S. 593 [33 L.Ed.2d 570, 92 S.Ct. 2694], and *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011]. *Perry* involved a nontenured professor whose annually renewable employment contract was not renewed after four years of service. The Supreme Court held petitioner could claim he had obtained de facto tenure, triggering a due process right to a hearing before being discharged from employment.

The instant circumstance is starkly dissimilar. Appellant's relationship with Medi-Cal has not been terminated. He may continue providing necessary services to qualified patients subject to the inconvenience of obtaining prior authorization.

Furthermore, his status as a provider of services is significantly distinguishable from that of either the welfare recipient in *Goldberg* v. *Kelly, supra*, 397 U.S. 254, or the professor in *Perry* v. *Sinderman, su-*

*pra*, 408 U.S. 593. In *Paramount Convalescent Center, Inc.* v. *Department of Health Care Services* (1975) 15 Cal.3d 489 [125 Cal. Rptr. 265, 542 P.2d 1], the California Supreme Court acknowledged the distinction in rejecting the contention of a nursing home that it was entitled to a hearing prior to nonrenewal of its Medi-Cal contract. The court explained "the purpose of the provisions [Cal. Admin. Code, tit. 22, §§ 51215 and 51451] is not to bestow a benefit upon the nursing homes which provide services to Medi-Cal recipients; it is to protect the patients. Both federal and state law emphasize that the basic premise of government-supported health programs including the Medi-Cal program, is to afford recipients the widest possible choice of qualified care facilities." (*Id.*, at pp. 496-497.) The court concluded that in both *Perry* and *Goldberg* "the chief beneficiary of the entitlement was the person who claimed he had the right to a hearing before being deprived of certain benefits, whereas, here the 'entitlement' is not intended to benefit the party which demands the hearing." (*Id.*) Thus, the rationale of those cases did not compel a holding that the nursing home was entitled to a hearing prior to nonrenewal of its contract with the department. (*Id.*)

Moreover, we discern no cognizable "property" interest of which appellant plausibly has been deprived. "Protected interests in property are normally 'not created by the Constitution. Rather, they are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits. *Board of Regents* v. *Roth*, 408 U.S. 564, 577 (1972)." *Goss* v. *Lopez* (1975) 419 U.S. 565, 572-573 [42 L.Ed.2d 725, 733, 95 S.Ct. 725]. Any "property" interest to which appellant might be entitled is defined and limited by pertinent law. As indicated, Medi-Cal covers only those health care services which are "reasonable and necessary." (Cal. Admin. Code, tit. 22, § 51303, subd. (a).) Section 14132 of the Welfare and Institutions Code enumerates the various services covered by Medi-Cal, notably including a "Physician . . . subject to utilization controls." Thus, application of utilization controls is by definition an includable aspect of any "property" interest to which a physician might otherwise be entitled as a Medi-Cal provider.

We conclude that appellant is neither legally nor constitutionally entitled to a hearing before implementation of the prior authorization requirement.

■ Appellant argues that the decision to place him on prior authorization was not properly made by the director, Beverlee Myers, as

required by statute and regulation. Section 14103.6 of the Welfare and Institutions Code provides: "The *director* ... may require that any individual provider must receive prior authorization before providing services when the *director* ... determines that the provider has been rendering unnecessary services." (Italics added.)

California Administrative Code, title 22, section 51455 provides: "(a) Any provider may be subjected to a requirement of prior authorization for all or certain specified services to be rendered under the California Medical Assistance Program, by written notice served on such provider from the *Director* or a carrier. The requirement for prior authorization may be imposed on such provider by the *Director* upon a determination that the provider has been rendering unnecessary services to a Medi-Cal beneficiary." (Italics added.)

Appellant protests that the letter signed by the director informing appellant of the decision to place him on prior authorization was written by a subordinate of the director, John Kelly, and that it was only after SUR discovered that the letter would have no legal effect without the director's signature that such was obtained. Appellant further complains that uncontroverted evidence shows that the director "had absolutely no substantive input whatsoever" in the decision to implement prior authorization. In asserting error appellant relies primarily upon the general rule limiting delegation of authority, enunciated in *California Sch. Employees Assn. v. Personnel Commission* (1970) 3 Cal.3d 139, at page 144 [89 Cal.Rptr. 620]: "As a general rule, powers conferred upon public agencies and officers which involve the exercise of judgment or discretion are in the nature of public trusts and cannot be surrendered or delegated to subordinates in the absence of statutory authorization."

In that case the school district's personnel commission had announced its decision to dismiss a teacher prior to a decision by the district's governing board to dismiss the teacher. The court determined under pertinent law that it was the function of the governing board to dismiss employees and the function of the personnel commission to review the board's action on appeal and in the absence of a prior board dismissal, the commission lacked jurisdiction to act. (*Id.*, at pp. 143-144.)

In the instant case, the decision requiring prior authorization was announced by the director; her name was signed to the letter and she alone in her official capacity assumed responsibility for the decision. It

was appropriate for the director to rely upon the research and recommendations of those officials—two of whom were physicians—most familiar with the circumstances of the subject case.[6] Although subordinates may have "decided" prior authorization was warranted, the official decision was made by the director as required by law.

The judgment is affirmed.

Puglia, P. J., and Reynoso, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 16, 1981.

---

[6]"[P]ublic agencies may delegate the performance of ministerial tasks, including investigation and determination of facts preliminary to agency action." (*California Sch. Employees Assn.* v. *Personnel Commission, supra*, 3 Cal.3d at p. 144.)