[Civ. No. 22987. Third Dist. Dec. 9, 1986.]

STEPHEN COWAN et al., Plaintiffs and Appellants, v.
BEVERLEE A. MYERS, as Acting Director, etc., et al.,
Defendants and Appellants.

## Counsel

Lynn S. Carman for Plaintiffs and Appellants.

W. Edward Barnes, Clifford C. Sweet, Melinda Bird, Kate Meiss and Georgia Bacile, as Amici Curiae on behalf of Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Thomas E. Warriner, Assistant Attorney General, Elizabeth C. Brandt and John W. Spittler, Deputy Attorneys General, for Defendants and Appellants.

Juan A. Del Real, Samuel D. Turner and John Daniel Kiser, as Amici Curiae on behalf of Defendants and Appellants.

## Opinion

**CARR, J.**—At issue in this appeal are certain provisions of the Medi-Cal Benefits Program (Welf. & Inst. Code, § 14000 et seq.), which limit health services to those "medically necessary to protect life or prevent significant disability" and whether such provisions are fatally inconsistent with the federal Medicaid Act (the Act). (42 U.S.C. § 1396 et seq.) The trial court found this limitation would unduly curtail medical assistance to the poor, contrary to the objectives of the Act and further found the system of prior authorization for health services, designed to implement the definition of medical necessity, was inconsistent with the Act. (Welf. & Inst. Code, § 14133.3, prior to 1985 amend., ch. 1411, § 2.) A writ of mandate issued from the trial court ordering the defendant state agencies and officials to refrain from enforcing either the limitation on medically necessary services or the prior authorization system.[1]

---

[1]Inexplicably, neither the judgment entered by the trial court nor the writ of mandate issued by the clerk of the court is part of the formal record on appeal. However, copies of each are included in the petition for supersedeas filed by the State on June 15, 1983. We take judicial notice of those records. On June 17, 1983, this court granted the petition of supersedeas staying enforcement of the trial court's judgment and all further proceedings thereon pending resolution of this appeal. The writ issued September 16, 1983, and remains in effect.

These state agencies and officials (hereafter collectively the State) appeal, contending: (1) the plaintiffs failed to exhaust their administrative remedies; (2) the definition of medical necessity in the Medi-Cal Benefits Program is consistent with federal law; and (3) the prior authorization program is likewise consistent with federal law. The plaintiffs have cross-appealed, contending the judgment erroneously failed to restrain a postservice system of authorization of Medi-Cal services.

During the pendency of this appeal the Legislature amended several Medi-Cal provisions and expanded the definition of medically necessary services. (§ 14059.5.)[2]     The version of Medi-Cal provisions presently in force is the relevant legislation for this appeal as "on appeals from judgments granting or denying injunctions, the law to be applied is that which is current at the time of judgment in the appellate court." (*City of Whittier* v. *Walnut Properties, Inc.* (1983) 149 Cal.App.3d 633, 640 [197 Cal.Rptr. 127], citing *Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 306, fn. 6 [138 Cal.Rptr. 53, 562 P.2d 1302].) The principal question on this appeal now is whether the amended provisions, which currently limit health services to those "medically necessary to prevent significant illness, to alleviate severe pain, to protect life, or to prevent significant disability," are fatally inconsistent with the Act. (42 U.S.C. § 1396 et seq.)

We conclude the Medi-Cal statutes are in compliance with federal law, but that current regulations governing medical coverage do not conform to those Medi-Cal statutes. This conclusion renders the cross-appeal moot and requires partial reversal of the judgment.

## FACTS

The Medi-Cal Benefits Program as originally enacted provided for benefits covering outpatient services, hospital services, nursing services, certain drugs, medical transportation, and home health care services among others. (See former § 14132.) In 1975, section 14132 was amended, and the provision of most health services was made "subject to utilization controls." (Stats. 1975, ch. 1005, § 3, subd. (b), p. 2360.) These controls on the utilization of Medi-Cal services were set out in section 14133.[3] The controls

_____

[2]Hereafter, all unspecified statutory references are to sections of the Welfare and Institutions Code.

[3]The three relevant types of controls are: (1) "Prior authorization, which is approval by a [State Department of Health] consultant, of a specified service in advance of the rendering of that service based upon a determination of medical necessity"; (2) "Postservice prepayment audit, which is review for medical necessity and program coverage after service was rendered but before payment is made. Payment may be withheld or reduced if the service rendered was not a covered benefit, deemed medically unnecessary or inappropriate"; [¶] (3) "Postservice postpayment audit, which is review for medical necessity and program coverage after service was rendered and the claim paid. The department may take appropriate steps to recover payments made if subsequent investigation uncovers evidence that the claim should not have been paid." (§ 14133, subds. (a), (b), (c).)

allowed the State to withhold coverage or payment for services which were determined to be medically unnecessary. The 1975 provisions did not define a "medical necessity."

In 1982, the Legislature enacted section 14133.3. This section defined the term "medical necessity" as used in relation to the established utilization controls. Section 14133.3 at that time provided in relevant part: "(a) The director shall require fully documented medical justification from providers that the requested services *are medically necessary to protect life or prevent significant disability,* on all requests for prior authorization. [¶] (b) For services not subject to prior authorization, the director shall additionally determine utilization controls which shall be applied to assure that the health care services provided and the conditions treated, *are medically necessary to protect life or prevent significant disability.* Such utilization controls shall take into account those diseases, illnesses, or injuries which require preventive health services or treatment to prevent serious deterioration of health." (Italics added.) The Legislature also determined to remove certain drugs from the "Medi-Cal Drug Formulary," a list of drugs for which no prior authorization is needed and to eliminate coverage for various "common medicine chest medical supply items, over-the-counter drug products, prescription drug products which afford minor symptomatic relief, and codeine and other narcotic analgesics." (Stats. 1982, ch. 328, § 53, subd. (2), p. 1606.) These statutory changes led to revisions in the Medi-Cal regulations, which limited health care services to those "which are reasonable and necessary to protect life or prevent significant disability, . . ." (Cal. Admin. Code, tit. 22, § 51303, subd. (a).)[4]

On or about September 1, 1982, the State sent a letter to all Medi-Cal recipients detailing the changes in Medi-Cal benefits. The letter stated in part: "Coverage of medical, surgical, and other services will be limited to only those services which are considered medically necessary to protect life or prevent significant disability. Those elective services which can be eliminated without seriously endangering your life or causing you a significant disability will no longer be approved . . . . If you are denied a service and

---

[4]For example, subdivision (a) of section 51303 of title 22 of the California Administrative Code provides in relevant part: "Health care services set forth in this article . . . which are reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain through the diagnosis or treatment of disease; illness or injury are covered by the Medi-Cal program, subject to utilization controls, . . . Such utilization controls shall take into account those diseases, illnesses, or injuries which require preventive health services or treatment to prevent serious deterioration of health." Similarly, title 22, California Administrative Code, section 51305, subdivision (a) provides: "Outpatient physician services are covered if they are medically necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain, subject to the limitations specified below."

your condition worsens to the point where further denial would endanger your life or cause significant disability, the service can be reconsidered for approval." The letter detailed certain drug program reductions and listed a number of drugs which would be covered only after prior authorization.

The plaintiffs are three Medi-Cal recipients and one resident taxpayer of California. They alleged that because of the Medi-Cal changes they were not receiving health services which were medically necessary, but were not necessary to protect life or prevent significant disability. They sought mandate to restrain the State from enforcing the new restriction on Medi-Cal services and to require the State to pay for all drugs, procedures, and services prescribed by physicians without the necessity of prior authorization. The trial court granted the relief requested. The State sought reconsideration on two grounds. First, the State informed the trial court that the Medi-Cal amendments had been approved by the federal Department of Health and Human Services as being in compliance with the Act. Second, the State proffered new evidence that one of the plaintiffs, Lorna Purkey, had successfully completed an administrative appeal, resulting in a granting of the treatment the petition alleged had been denied her. The State contended this rendered significant portions of the case moot. The motion for reconsideration was denied, and judgment granting a peremptory writ of mandate was entered. This appeal followed.

Thereafter, the Legislature enacted section 14059.5, which provides: "A service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."

## DISCUSSION

### I

The State first contends the trial court lacked jurisdiction to entertain the instant petition because the plaintiffs failed to allege exhaustion of the appropriate administrative remedies. This contention would have some merit if plaintiffs were simply challenging the denial of Medi-Cal benefits. In such circumstances, the right to an administrative appeal hearing is clear. (§ 10950; Cal. Admin. Code, tit. 22, § 50951 et seq.) In fact, the record discloses that subsequent to trial the treatment requested by plaintiff Purkey was granted through just such an administrative appeal.[5] The denial of benefits, however, was not the only grievance raised by the petition. The

---

[5] The record also reveals that plaintiff Cowan's request for authorization of certain drugs was also approved.

plaintiffs also alleged the relevant Medi-Cal statutes and regulations were violative of federal law. "An administrative agency . . . has no power: . . . [¶] (c) To declare a statute unenforceable, or to refuse to enforce a statute on the basis that federal law or federal regulations prohibit the enforcement of such statute unless an appellate court has made a determination that the enforcement of such statute is prohibited by federal law or federal regulations." (Cal. Const., art. III, § 3.5, subd. (c).) Moreover, the same code section which granted plaintiffs an administrative appeal to contest the denial of Medi-Cal benefits provides: "there is no right to a state hearing when . . . the sole issue is a federal or state law requiring an automatic change in services or medical assistance which adversely affects some or all recipients." (§ 10950.) As the eventual granting of benefits to two of the plaintiffs renders their denial of benefits claim moot, the sole issue remaining as to them is the validity of the relevant statutes and regulations. Plaintiffs correctly contend any attempt to exercise an administrative remedy on this issue would be inadequate, thus making the exhaustion requirement inapplicable. (*Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 342 [124 Cal.Rptr. 513, 540 P.2d 609].) While the plaintiffs in this case may no longer have a direct grievance with the State (i.e., the denial of Medi-Cal benefits), the very important question of the validity of the Medi-Cal coverage restrictions remains alive both as to the taxpayer-plaintiff (Mayer) and to Medi-Cal recipients in general. (See *Grier* v. *Alameda-Contra Costa Transit Dist.* (1976) 55 Cal.App.3d 325, 330 [127 Cal.Rptr. 525].) We conclude the present appeal is properly before this court and is barred neither by mootness nor the failure to exhaust administrative remedies.

## II

The State next asserts the trial court erred in finding the definition of "medically necessary" services in section 14133.3, now replaced by a similar but broader definition in section 14059.5, conflicted with the Act.[6] We perceive the fundamental question presented by this contention to be the crux of the appeal: Who decides what Medi-Cal services qualify as "medically necessary," the physician or the State? We conclude plaintiffs are in error when they assert the physician is the sole arbiter of what constitutes a medical necessity. The Act permits the states discretion to determine on the basis of need which services shall be provided as part of the Medicaid program. The current California definition of medical necessity in section 14059.5, like its predecessor in section 14133.3, is a proper limitation on services, within the discretion provided by the federal law.

---

[6]In 1985, the Legislature also amended section 14133.3 to conform to section 14059.5, insofar as the latter defines "necessary medical services."

We therefore reverse the judgment of the trial court insofar as it held otherwise.[7]

## A

We first examine the Act. One of its express purposes is to enable "each state, as far as practicable under the conditions in such state, to furnish . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services . . . ." (42 U.S.C. § 1396.) To accomplish this purpose, the Act appropriates funds to make payments to states with plans for medical assistance which have been submitted to and approved by the Secretary of Health and Human Services. (*Ibid.*) ▊ The Act requires participating states to provide qualified individuals with financial assistance in five general categories of services: (1) inpatient hospital services; (2) outpatient hospital services; (3) laboratory and X-ray services; (4) skilled nursing facility services; and (5) physician services. (*Beal* v. *Doe* (1977) 432 U.S. 438, 440-441 [53 L.Ed.2d 464, 469-470, 97 S.Ct. 2366].) "Although [the Act] does not require States to provide funding for all medical treatment falling within the five general categories, it does require that state Medicaid plans establish 'reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [the Act].'" (*Id.*, at p. 441 [53 L.Ed.2d at p. 470].) "This language confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." (*Id.*, at p. 444 [53 L.Ed.2d at p. 472].)

The parties appear to agree that a state plan may limit services to those which are "medically necessary."[8] They disagree over who decides which services qualify as medically necessary. The trial court adopted plaintiffs' position that "[t]he spirit of the Medicaid Act is that *physicians* make the decision of whether or not certain treatment is 'medically necessary.'" Support for this position is found in *Pinneke* v. *Preisser* (8th Cir. 1980) 623

---

[7]Plaintiffs' appellate brief divides the trial court's ruling into six separate "judgments," which it asserts must all be affirmed. (E.g., "Judgment Two must be affirmed. . . .") Plaintiffs should be aware there is but one final judgment in an action, which finally determines the rights of parties in relation to the matter in controversy. (Code Civ. Proc., § 577; *Maier Brewing Co.* v. *Pacific Nat. Fire Ins. Co.* (1961) 194 Cal.App.2d 494, 497 [15 Cal.Rptr. 177].) This error merits comment in light of counsel's berating of the State's legal argument as "shallow," "a joke" and "frivolous." Such hyperbole is unbecoming where one's own argument is less than paradigmatic.

[8]This conclusion is inescapable. The federal Medicaid regulations provide: "The [Medicaid] agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." (42 C.F.R. § 440.230(d) (1985).)

F.2d 546, 550, wherein it was stated: "The decision of whether or not certain treatment or a particular type of surgery is 'medically necessary' rests with the individual recipient's physician and not with clerical personnel or government officials." The sweep of this language is less broad than it would seem, however, when considered in the context in which it was made. In *Pinneke,* the plaintiff underwent sex reassignment surgery and applied for funding under the Iowa Medicaid program. Funding was denied because Iowa's Medicaid program specifically excluded coverage for sex reassignment surgery. (*Id.,* at p. 547.) The court noted this amounted to an irrebutable presumption that sex reassignment surgery can *never* be "medically necessary," even though it may be the *only* treatment for a condition of transsexualism. (*Id.,* at pp. 548-549.) As the Medicaid regulations prohibit discrimination on the basis of medical condition, the court held the procedure fell into both "'inpatient hospital services'" and "'physicians' services'" which the state plan had agreed to provide. (*Id.,* at p. 550.)

*Pinneke* does not stand for the proposition that the physician is the sole arbiter of medical necessity. Rather, it holds that once a state plan has agreed to cover certain types of services, it may not exclude covered services for one particular *condition* where the physician determines the treatment is necessary. *Pinneke* illustrates that there are in fact two levels of medical necessity inherent in the Medicaid scheme. First, the state must decide which *services* are necessary; then, out of the covered services, the physician may determine which *treatment* is necessary for a particular condition. This two-part test was expressed in *Preterm, Inc.* v. *Dukakis* (1st Cir. 1979) 591 F.2d 121.) In that case, the court considered dicta in *Beal* v. *Doe, supra,* 432 U.S. at pages 444-445 [53 L.Ed.2d at p. 472], that "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage, . . ." The *Preterm* court held: "[W]e do not believe that we should read this dictum as signalling a flat rule that all services within the five general categories deemed 'medically necessary' by a patient's physician must be provided by the state plan. [¶] Such a reading, permitting the most varied content to the words 'necessary medical services,' the variations being theoretically limited only by the diversity of physicians, would seem at war with the goals of consistency and fairness in the administration of the statute. We see two levels of judgment as to medical necessity in the statutory scheme. The first is the macro-decision by the legislature that only certain kinds of medical assistance are deemed sufficiently necessary to come under the coverage of its plan. The second is the micro-decision of the physician, that the condition of his patient warrants the administering of a type of medical assistance which that plan makes available." (*Preterm, Inc.* v. *Dukakis, supra,* 591 F.2d at p. 125.) In *Preterm* the court was concerned with the "macro-decision" of the Massachussetts legislature to limit state funding of abortions, in cases other

than rape or incest, to those necessary to save the life of the woman. (*Ibid.*) The court concluded this restriction improperly discriminated against a particular condition, a medically complicated pregnancy, by restricting treatment for this condition to life and death situations. (*Id.*, at p. 126.)

In both *Pinneke* and *Preterm*, the state Medicaid plan singled out a specific condition and placed special restrictions on services for that condition. Such discrimination, where the state plan generally provided for the appropriate services and the treating physician felt such services were medically necessary, was held to be violative of the Act in both cases. Both courts relied on 42 Code of Federal Regulations, section 440.230(c), which provides: "The Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." As pointed out by amicus secretary of Health and Human Services, however, the exclusion of treatment for a specific condition is considerably different from a general exclusion of certain services. Illustrative is *Rush* v. *Parham* (5th Cir. 1980) 625 F.2d 1150. *Rush*, like *Pinneke*, was a case involving a denial of funding for sex reassignment surgery. (*Id.*, at p. 1153.) In *Rush*, however, the reason for denial was that the Georgia Medicaid plan excluded reimbursement for experimental forms of treatment, i.e., treatment not generally recognized as effective by the medical profession. (*Id.*, at pp. 1154-1155.) The court held the state's "responsibility to establish standards extends at least to the shaping of a reasonable definition of medical necessity." (*Id.*, at p. 1156.) "This does not remove from the private physician the primary responsibility of determining what treatment should be made available to his patients. We hold only that the physician is required to operate within such reasonable limitations as the state may impose." (*Ibid.*) The court concluded that Georgia's definition of medically necessary services could reasonably exclude experimental surgery and remanded for a finding as to whether transsexual surgery was experimental. (*Id.*, at pp. 1156-1157.)

At first blush, *Rush* and *Pinneke* appear completely at odds. Sexual reassignment surgery could properly be excluded in the former, but not in the latter. The difference lies in the nature of the two exclusions. In *Rush*, the exclusion for experimental surgery was generic. It did not discriminate against any particular treatment or condition. In *Pinneke*, on the other hand, the exclusion was treatment specific, singling out a particular condition. In the language of *Preterm*, the Legislature in *Rush* made a proper "macro-decision" to exclude certain services from coverage by determining they were not medically necessary. In *Pinneke*, however, the Legislature intruded into the "micro-decision" of the physician by deciding that one particular treatment within the generally covered service of surgery was excluded, even though it might be necessary to treat a specific condition. The two

cases can be reconciled in a manner which provides considerable insight into the objectives of the Act. ■ A state may place a generic limit on Medicaid services based upon a judgment as to the degree of medical necessity of those services, so long as it does not discriminate on the basis of the specific medical condition which occasions the need. (*Curtis* v. *Taylor* (5th Cir. 1980) 625 F.2d 645, 652.)

■ Applying this principle to the case at bar, we conclude the limitation of Medi-Cal services to those necessary to protect life, to prevent significant disability or illness, or to alleviate severe pain (§ 14059.5) is consistent with the objectives of the Act. The restriction does not single out any particular condition. It merely represents a legislative judgment that the medical services provided be restricted to those cases where they are most needed. Plaintiffs' contention that Medicaid requires states to provide *all* services within the covered categories which a physician determines are medically necessary is neither correct nor workable.[9] (See Note, *State Restrictions on Medicaid Coverage of Medically Necessary Services* (1978) 78 Colum.L.Rev. 1491, 1498-1502 (hereafter *Medicaid Coverage*).) The Medicaid regulations expressly permit the State to limit services on the basis of medical necessity. (42 C.F.R. § 440.230(d).) We are convinced the Act did not intend the *physician* to be the sole arbiter of medical necessity. Not only would such a rule result in inconsistent and unfair applications based on the variation between physicians (*Preterm, Inc.* v. *Dukakis, supra,* 591 F.2d at p. 125), but the State's requirement of reimbursement would be limited only by the imagination of physicians. Such open-ended liability was not the intent of the Act. (See Note, *The Determination of Medical Necessity: Medicaid Funding for Sex-Reassignment Surgery* (1980) 31 Case W. Res.L.Rev. 179, 184-185, 202 (hereafter *Medical Necessity*).) The express purpose of the Act was to enable states to provide health care to the needy *"as far as practicable under the conditions in such State. . . ."* (42 U.S.C. § 1396.) (Italics added.) Sections 14059.5 and 14133.3 represent a proper effort by California to limit Medi-Cal services on the basis of medical necessity.

B

■ Both plaintiffs and various welfare rights groups acting as amici curiae urge that even if the Act allows for restrictions on services based on medical necessity, the particular restriction employed by the State in this case is unreasonable. They point out the test in *Beal* v. *Doe* requires state

---

[9]The cases cited by plaintiffs state only that Medicaid requires the provision of all medically necessary services. They do not indicate *who* defines a medical necessity or *how* it is to be defined. (See, e.g., *Doe* v. *Busbee* (N.D.Ga. 1979) 471 F.Supp. 1326, 1330.)

Medicaid standards to be "'reasonable'" as well as "'consistent with the objectives'" of the Act. (*Beal* v. *Doe, supra,* 432 U.S. at p. 444 [53 L.Ed.2d at p. 472].) They urge the Medi-Cal standard is unreasonable because it restricts the provision of necessary health services to life or death situations. The amici welfare rights organizations paint a horrendous picture in which Medi-Cal recipients are routinely denied benefits for painful and contagious disorders because they are not life-threatening. Contrary to plaintiffs' urgings, however, our task is not to assess the reasonableness of the *application* of the Medi-Cal standard of medical necessity to any set of facts, real or hypothetical.[10] Rather, the question presented by this case is whether the Legislature's restriction of Medi-Cal services to those medically necessary to protect life, to prevent significant disability or illness, or to alleviate severe pain, is unreasonable on its face. We answer this question in the negative.

As an initial matter, we are unpersuaded by plaintiffs' doomsaying view that a needy individual would have to be in a life or death situation before Medi-Cal would intervene. Plaintiffs ignore that portion of the previous standard in section 14133.3 which permitted Medi-Cal services when "medically necessary . . . to prevent significant disability." The concept of preventing significant disability encompasses medical intervention at an early stage in a disorder, to *prevent* future disability. (See *Medicaid Coverage, supra,* at p. 1498.) Nothing in either the prior or present definition of medical necessity requires a Medi-Cal provider to stand idly by until a patient is actually disabled by an illness. (*Id.,* at p. 1498, fn. 62.) The opinions of plaintiffs' experts aside, nothing in the record shows the State has denied or will deny Medi-Cal benefits to any eligible individual who demonstrates a medical need which raises a threat of illness or disability.

Plaintiffs rely heavily on 42 Code of Federal Regulations section 440.230(b). That section provides: "Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." In arguing that section 14133.3, prior to its amendment in 1985,[11] violated this regulation, plaintiffs assume the "purpose" referred to therein is to provide *all* medically necessary services. We have determined that a state Medicaid plan need not offer all services within the five general categories listed by the Act. (*Preterm, Inc.* v. *Dukakis, supra,* 591 F.2d at p. 125.) The regulation

---

[10]As previously noted, the only two plaintiffs who testified as to a denial of benefits (Cowan and Purkey) were ultimately shown to have received Medi-Cal assistance as requested. The third plaintiff who alleged a denial of benefits (DuPont) did not testify at trial. The remaining petitioner premised his standing on his status as a taxpayer. Thus, whether the restriction was reasonable as applied to any particular Medi-Cal recipient was not an issue before the trial court.

[11]See footnote 6, *ante.*

cited is not a "content" regulation, i.e., establishing which services must be provided (cf. 42 C.F.R. §§ 440.210, 440.220), but is instead concerned with the *sufficiency* of the services which are provided. Once the state determines to provide a certain type of service, for example X-ray services or dental services, the state must ensure there are adequate resources to achieve the purpose of the service. (See *Medicaid Coverage, supra,* at pp. 1501-1516.) In the present case, the purpose of the services provided by Medi-Cal is to provide the needy with medical assistance which is necessary to protect life, to prevent significant disability or illness, or to alleviate severe pain. (§ 14059.5.) So long as the programs provided are sufficient to meet this level of service and achieve this purpose, no violation of 42 Code of Federal Regulations section 440.230(b) will occur. Section 14059.5 does not violate the federal regulation. It simply establishes the standard by which the sufficiency of any service must be judged.

Finally, and most important, plaintiffs' assertion of the unreasonableness of the State's standard of medical necessity fails to recognize that the federal agency charged with considering and certifying state Medicaid plans *approved* the standard set forth in section 14133.3 prior to its amendment in 1985. The trial court's statement of decision, prepared by plaintiffs, attempts to discount this approval by finding that because the standard is incorporated into the Medi-Cal plan by reference, "[o]ne would have to be especially astute to apprehend from such presentation of the 'State Plan' that physicians' services are drastically curtailed to only those 'medically necessary to protect life or prevent significant disability.'" The record does not support this finding. On *each page* of the "Medi-Cal Benefits Chart" submitted to the Department of Health and Human Services, the heading "Program Coverage" is marked with a double asterisk, which is explained on *each page* as follows: "Coverage is limited to medically necessary services as defined in Section 51303 (a)." Title 22, California Administrative Code section 51303, subdivision (a), provides in part: "Health care services set forth in this article . . . which are reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain through the diagnosis or treatment of disease, illness or injury are covered by the Medi-Cal program, subject to utilization controls, . . ." We fail to see how this limitation could have been made plainer, short of printing it in full on every page of the plan submitted to the federal agency. The trial court simply refused to accord the approval of the responsible federal agency the deference it deserved. ■ "'[W]e must be mindful that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . .""" (*Beal* v. *Doe, supra,* 432 U.S. at p. 447 [53 L.Ed.2d at p. 473].) ■ There are no such indications in this case. California determined to limit its Medi-Cal benefits program on the basis of medical necessity. The Department of Health and

Human Services, upon being fairly apprised of the standard to be employed, approved the plan as reasonable and consistent with the objectives of the Act. The trial court erred in finding the Medi-Cal limitation unreasonable.

Moreover, we are convinced it is the formulation of the trial court, leaving the determination of medical necessity solely in the hands of the providers, that is unreasonable. In such circumstances it is the physician who would determine whether he or she should be reimbursed for providing health care. It is not difficult to see what that determination would be in every case. With due respect to the professionals who provide health care services under the Medi-Cal benefits program, the Act never intended to grant these physicians carte blanche to charge services to the State. We conclude the limitation on services in sections 14059.5 and 14133.3 is both reasonable and consistent with the objectives of the Act.

### III

The State next contends the trial court erred in finding the Medi-Cal system of prior authorization of services violative of the Act. While the prior authorization system applies to all Medi-Cal services, the focus at trial was on prior authorization as applied to those drugs which were not on the Medi-Cal formulary. The trial court found this system "is inconsistent with the mandate of the Medicaid Act that physicians, not the State, make the determination of what treatment (and drugs) are proper and 'medically necessary' for the needy patient." We conclude this finding is in error.

Prior authorization is "approval by a department consultant, of a specified medical service in advance of the rendering of that service based upon a determination of medical necessity." (§ 14133, subd. (a).) The primary mechanism for prior authorization of services is the treatment authorization request (TAR). TARs are submitted by physicians in advance of providing the services. They can be submitted either in writing or by telephone. The request is transcribed onto a form (if submitted by telephone) and then given to either a physician or pharmacist, who makes the decision whether to authorize treatment. Not all physicians' services or drugs require TARs. In emergencies, the physician may treat the patient first, and then request retroactive authorization.[12] Office visits do not require TARs, while elective hospitalizations do. As for drugs, a TAR is only required if the prescribed

---

[12]Title 22, California Administrative Code, section 51003, subdivision (b), provides in relevant part: "Retroactive approval of requests for prior authorization may be granted only under the following conditions: . . . [¶] (3) When communication with the Medi-Cal Consultant could not be established and provision of the required service should not have been delayed; under this condition the request for retroactive authorization must be received by the Medi-Cal Consultant within 10 working days after the service is provided or initiated."

drug is not on the Medi-Cal formulary. The processing time for each TAR is one to three days for drugs, and five to seven days for physicians' services.[13]

The State urges the Act and its attendant regulations specifically allow individual states to "place appropriate limits on a service based on . . . utilization control procedures." (42 C.F.R. § 440.230(d); see also 42 U.S.C. § 1396a(a)(30).) The TAR system is simply one type of procedure to control the utilization of Medi-Cal services. (§ 14133, subd. (a).) The trial court's principal objection to the TAR system was its inconsistency with the perceived Medicaid mandate that the physician determine what treatment was "medically necessary" for the needy patient. We have already determined the State's restriction on the meaning of medical necessity is proper under the Act. It follows that if the State can limit services to situations where they are "medically necessary" as defined, there must be some mechanism by which the State can enforce its definition. That prior authorization is a permissible utilization control is shown by the approval of this system by the secretary of Health and Human Services. In fact, the system of prior authorization has been in place since 1975. (See Stats. 1975, ch. 1005, § 2, p. 2359, § 5, p. 2362.) Plaintiffs' real objection is not to the concept of prior authorization, but to the fact the 1982 Medi-Cal amendments greatly increased the number of services and drugs subject to prior authorization. Conceding the TAR system may be less convenient for health care providers, does this inconvenience render the system violative of the Act? The answer is "no."

In *Margulis* v. *Myers* (1981) 122 Cal.App.3d 335 [175 Cal.Rptr. 787], we considered the application of prior authorization controls to all Medi-Cal services provided by a particular physician who engaged in an unusual type of practice.[14] The physician contended it was improper to impose the requirement of prior authorization without first giving him a hearing. This court upheld the prior authorization order. We first noted the pertinent federal regulations required that the state Medicaid agency "'must create a statewide surveillance and utilization control program that—[¶] (a) Safeguards against unnecessary or inappropriate use of Medicaid services and against excess

---

[13]Consistent with the trial court's philosophy that health care providers should be the sole determiners of what is medically necessary, the court found fault with doctors of pharmacy making decisions with respect to drug TAR. This same objection was voiced in *Dodson* v. *Parham* (N.D.Ga. 1977) 427 F.Supp. 97, which considered the prior approval plan of Georgia's Medicaid law.

[14]Although the physician maintained regular office hours, the majority of his Medi-Cal claims were for house calls occurring during the evenings and on weekends. Further, numerous claims were for persons of the same surname rendered weekly over a period of years. The diagnoses for these repeated visits amounted to repetitious cases of a common cold. (*Margulis* v. *Myers, supra*, 122 Cal.App.3d at pp. 338-339.)

payments; . . . [and] [¶] (c) Provides for the control of the utilization of all services provided under the plan . . . .'" (*Id.,* at p. 340; see 42 C.F.R. § 456.3.) In holding that the physician was not entitled to a hearing before implementation of the prior authorization order, we reasoned that "[a]lthough prior authorization inconveniences appellant it is applied not as a penalty, *but as a means by which the department ensures that only necessary services are provided.*" (*Margulis* v. *Myers, supra,* 122 Cal.App.3d at p. 342.) (Italics added.) Implicit in the *Margulis* holding is the conclusion that prior authorization is a permissible method of ensuring that Medi-Cal services are limited to those defined as medically necessary. We see no reason to deviate from that conclusion in the present case.

Nothing in *Dodson* v. *Parham, supra,* 427 F.Supp. 97, compels a different result. Plaintiffs incorrectly assert "*Dodson* v. *Parham* controls this judgment." ■ As an initial matter, the decisions of the lower federal courts, even on federal questions, are not binding on this court. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129]; *Debtor Reorganizers, Inc.* v. *State Bd. of Equalization* (1976) 58 Cal.App.3d 691, 696 [130 Cal.Rptr. 64].) In any event, *Dodson* fails even as persuasive authority, in part because it is factually distinguishable, but also because we find implicit in that decision a standard for assessing prior authorization schemes which, if it were applied to Medi-Cal, would make it impracticable for the department to satisfy the federal mandate of creating a utilization control program that safeguards against unnecessary use of Medicaid services. (42 C.F.R. § 456.3.)

In *Dodson,* the court considered a Georgia Medicaid plan which placed certain drugs on a list or formulary and required prior authorization for those drugs not appearing on the list. The process was very similar to that under consideration in the present case. (*Dodson* v. *Parham, supra,* 427 F.Supp. at pp. 100-101.) In 1976, the formulary was reduced in an effort to curb certain excesses and abuses under the former plan. (*Id.,* at pp. 101-102.) The court held the plaintiffs challenging the new list and prior approval system had made a sufficient showing to justify a temporary injunction against the new program. (*Id.,* at p. 108.) "Critical to our finding that [the formulary] *taken together* [original italics] with the prior approval system is medically unsound is that the existing approval mechanisms *do not contain emergency procedures which would allow physicians to either obtain prior approval on weeknights, weekends, and holidays, or alternatively, to allow the attending physician to himself certify the medical need and the emergency situation* to assure that his patient will receive perhaps a five-day dosage *until prior approval could be obtained.*" (Italics added.) (*Id.,* at p. 108.) It is immediately apparent that the most critical shortcoming of the prior approval system in *Dodson* does not exist in the Medi-Cal plan. Both

treatment and drugs may be provided in emergencies. Further, if communication with a Medi-Cal consultant could not be established and the service should not have been delayed, the Medi-Cal provider may get retroactive authorization for up to 10 days after the service was provided or initiated. (Cal. Admin. Code, tit. 22, § 51003, subd. (b)(3).) In this respect, *Dodson* is simply not apposite to the present case.[15]

Nor do we find persuasive the particular holding in *Jeneski* v. *Myers* (1984) 163 Cal.App.3d 18 [209 Cal.Rptr. 178] that the use of a doctor of pharmacy to render decisions on the issuance of TARs as to drugs invalidates the prior authorization procedure. This holding was based on the assertion these drug decisions must be made only by "'one who is skilled in the medical field and perhaps even in certain specialties.'" (163 Cal.App.3d at p. 32.) No evidence to support this view was cited by the *Jeneski* court and the evidence that was recited in the opinion was from Medi-Cal recipients, doctors and pharmacists on the hazards of removing from the Medi-Cal formulary antihistamines, topical dermatological preparations, cold preparations and certain prescription drugs. In our view, the task of approving or tentatively denying a drug TAR is most competently performed by one trained and skilled in the "practice of preparing, preserving, compounding, and dispensing drugs," a pharmacist (see "pharmacy," Webster's Ninth New Collegiate Dict. (1984) p. 881).

We do concur with *Jeneski* v. *Myers, supra,* that if the department intends to deny a TAR it must afford the Medi-Cal recipient the opportunity for a predenial hearing. (*Jeneski* v. *Myers, supra,* 163 Cal.App.3d 18.) ■ "Medicaid recipients have a right to a hearing prior to any state action resulting in the suspension, reduction, discontinuance, or termination of assistance." (*Bracco* v. *Lackner* (N.D.Cal. 1978) 462 F.Supp. 436, 452, citing 45 C.F.R. § 205.10(a)(5).) Inasmuch as this right was previously guaranteed under federal regulations with which Medi-Cal provisions must be consistent, that the Legislature did not make specific provisions for such hearings in enacting the prior approval plan at issue does not amount to an infirmity in the TAR scheme thus adopted.

[15]Similarly inapposite is *California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637 [106 Cal.Rptr. 555]. That case involved Medi-Cal regulations which were subsequently repealed. (*Id.,* at p. 649.) Acknowledging that the case was technically moot, this court went on to hold that the *procedures* by which the regulations were enacted violated both the Administrative Procedure Act and the Medi-Cal Act. (*Id.,* at p. 655.) In the present case plaintiffs do not contest that the statutes and regulations under consideration were properly enacted.

We note parenthetically that even lacking emergency procedures the plan in *Dodson* was not deemed per se medically unsound. (*Dodson* v. *Parham, supra,* 427 F.Supp. at p. 108.) Contrariwise, the trial court in this case held, notwithstanding the noted emergency procedures, that the Medi-Cal prior approval plan was unreasonable on its face.

We conclude the trial court erred in finding the TAR system of prior authorization violative of the Act. Prior authorization is a permissible utilization control device contemplated by the Act, approved by the responsible federal agency and upheld by this court in *Margulis* v. *Myers, supra,* 122 Cal.App.3d 335. Since the State may define which services are medically necessary, it is proper to enforce this definition prior to provision of the services in appropriate circumstances. The TAR system is consistent with federal law.

## IV

In one respect we are constrained to affirm the judgment of the trial court, but not for the reasons cited in its statement of decision. The department is without power to enforce any regulation which defines a medical necessity as that which is "medically necessary to protect life or prevent significant disability." The operative definition of a medical necessity is presently set forth in section 14059.5 as "reasonable and necessary to protect life, to prevent significant disability, or to alleviate severe pain" and section 14133.3 mandates application of this standard by the director of the department. As the regulations enjoined by the trial court still include the former definition of a medical necessity, those regulations are unenforceable. Practically, as the regulations are generally duplicative of the statutory authority the department is not precluded from enforcement of the statutory standards set forth in the amended legislation, section 14059.5.

## V

The plaintiffs' cross-appeal points out a deficiency in the writ of mandate issued by the trial court. The writ precluded the State from utilizing prior authorization as a method of enforcing the standard of medical necessity set out in section 14133.3, but failed to enjoin the use of either postservice prepayment audits or postservice postpayment audits. (§ 14133, subds. (b), (c).) Plaintiffs contend the trial court's statement of decision struck down these postservice utilization controls in addition to the prior authorization system. Plaintiffs' cross-appeal seeks relief from this omission to prevent the State from doing postservice what the writ commands it may not do by prior authorization.

The matter is rendered moot by our holding the State may enforce its definition of medical necessity through the prior authorization system. If the State may reject a particular service as medically unnecessary prior to its provision, it follows a fortiori that it may do so after the service has been provided. Moreover, the cross-appeal fails to recognize that the federal Medicaid regulations *require* that a state plan contain "a post-payment

review process that—[¶] (b) [i]dentifies exceptions so that the agency can correct misutilization practices of recipients and providers." (42 C.F.R. § 456.23(b).) The Medi-Cal postservice utilization control audits are consistent with the Act.

DISPOSITION

The judgment is reversed and the writ of mandate vacated save and except as to that portion restraining enforcement of regulations implementing the Welfare and Institutions Code which sets the standard for approval of Medi-Cal services and provides billings as "medically necessary to protect life or prevent significant disability." Costs shall be recovered by the appellant State agencies.

Evans, Acting P. J., concurred.

**BLEASE, J.**—I dissent because the majority opinion is premised upon an improper characterization of the issues and hence does not address the dispositive question of statutory interpretation, the answer to which dictates a contrary result. The consequence of this oversight will be visited upon the tens, perhaps hundreds, of thousands of persons who will be denied needed medical services because their illnesses are less than life threatening or are deemed less than significant or are accompanied by pain that is less than severe.

The critical mistake is that, with respect to the question—who determines the scope of medical services required to be offered under the federal law?— the majority opinion sets up a false dichotomy between the Legislature and the *individual* physician. The correct answer is neither, for it is a judicial question. The determination of the scope of medical services which the state must offer, because it requires an interpretation of the governing federal law, is a question for the courts to resolve. The dispositive question is whether the California statute conflicts with the controlling federal statutes. The judicial responsibility to determine if there is a conflict cannot be evaded by reposing it elsewhere.

The interpretive issue, never addressed by the majority opinion, is: whether the language of the federal statute, which mandates that the state provide *at the minimum* the care and services listed in paragraphs (1) through (5) and (17) of United States Code section 1396d(a) of title XIX (namely: "(1) inpatient hospital services," "(2)(A) outpatient hospital services," "(3) other laboratory and x-ray services," "(4)(A) skilled nursing facility services," "(5) physicians' services" and "(17) services furnished by a nurse-midwife"), can be squared with California's drastic restriction of these

services to those which are "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain." These restrictions are accomplished by defining "medical necessity" so as to include them. (Welf. & Inst. Code, § 14059.5.)

As will be shown, the governing federal statute bars the imposition of these restrictions. The United States Supreme Court has noted that the failure of a state to provide necessary medical services in the mandatory categories would raise serious statutory problems. (*Beal* v. *Doe* (1977) 432 U.S. 438, 444-445 [53 L.Ed.2d 464, 472, 97 S.Ct. 2366].) In my view, such problems are fatal to the restrictions imposed by California.

The dispositive question is—what is the *federal* definition of "medical necessity?"—for that is what is binding upon the states and hence upon the Legislature and the physician alike. The short answer is that the federal statutes provide a definition in title XVIII (42 U.S.C. § 1395y(a)(1)(A)), which has consistently been equated with "medical necessity" in the federal case law. It provides that a service is "medically necessary" if it is "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member . . . ." This controlling definition is facially at odds with the more restrictive California law, which, perforce, must give way.

The majority opinion avoids this conclusion by avoiding the question to which it is the answer. It engages the wrong question which begets the wrong answer. Because at the outset the majority opinion goes off the tracks, I begin the analysis of the governing law, necessarily, at the place of derailment, the beginning.

I

This is an appeal by the state from a judgment granting a peremptory writ of mandate. The writ, inter alia, would command the Director of the Department of Health Services not to enforce or implement Welfare and Institutions Code sections 14133.3 and 14133, subdivision (a). The theory of the judgment is that these statutes conflict with controlling federal law. Section 14133.3 limits coverage of the Medi-Cal program to services that are "medically necessary," as defined by statute. Section 14133, subdivision (a) provides for a system of prior authorization for Medi-Cal services; under the system certain nonemergency services require administrative approval in advance of rendition or payment is denied. I consider each aspect of the peremptory writ separately.

II

Medi-Cal is California's medical assistance program under the Medicaid Act, Title XIX of the Social Security Act of 1956. The program funds medical assistance benefits for eligible needy persons who are aged, blind, disabled, or in families with dependent children. Once a state opts for participation in such a federal grant-in-aid scheme, the substance of its participation is governed by federal law. (E.g., *King* v. *Smith* (1968) 392 U.S. 309, 333, fn. 34 [20 L.Ed.2d 1118, 1134, 88 S.Ct. 2128].) Thus, state legislative enactments or administrative regulations which conflict with federal statutes, or lawful federal regulations implementing them, are invalid and void. The question on this appeal is whether the California statutes, which would limit Medi-Cal to care and services "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain," conflict with federal law.

The trial court found such a provision conflicts with federal law, inter alia, because it denies medical assistance for care and services which are "medically necessary" contrary to the requirements of title XIX. I disagree with the reasoning of the trial court insofar as it implies that the standard of "medical necessity" is to be determined by individual physicians, but not with the conclusion that the state's definition of medical necessity conflicts with title XIX.

The purpose of the Medicaid program is set forth in 42 United States Code section 1396 as follows: "[To enable] each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care . . . ." This statement of purpose was enacted in 1965 when the Social Security Act was amended in pertinent part to expand the Medicaid program. (Pub.L. No. 89-97 (July 30, 1965) 79 Stat. 286; see Sen. Rep. No. 404, 1965 U.S. Code Cong. & Admin. News, p. 1943.) The amendment required for the first time that states participating in the program provide medical assistance for certain designated categories of medical care and services. (See *id.,* at pp. 1950-1951.) Presently these mandatory categories are inpatient hospital services, outpatient hospital services, other laboratory and X-ray services, skilled nursing home services, physician services, and services furnished by a nurse midwife. (42 U.S.C. § 1396a(a)(10).) The Senate report, in a segment entitled "scope of medical assistance," refers to these services as minimum benefit requirements. (See 1965 U.S. Code Cong. & Admin. News, *supra,* at p. 1950-1951.)

The threshold question is: is the state at liberty to fashion its own definition of medical necessity as a limitation on these minimum benefit requirements? The answer is no. The meaning of "medical necessity" is fixed by the federal Medicaid statute and the companion amendments made in 1965 to the Medicare Act, Title XVIII of the Social Security Act of 1956. As appears, California's challenged definition of medical necessity would result in constriction of benefits below the minimum benefit requirements of the federal statute and hence it must be stricken.

A

I first briefly set out the background of the challenged statutes.

At the outset of California's medical assistance program under the 1965 amendments to title XIX the federal mandatory categories and several optional categories of care and services were provided under the rubric of "[h]ealth care and related remedial or preventive services." (See former Welf. & Inst. Code, §§ 14005, 14006.5, 14053, Stats. 1966, Second Ex. Sess. 1965, ch. 4, pp. 105-106, 107, 110-111.) The only apparent limitation of coverage was contained in former section 14059 which, in conjunction with former section 14052, limited most services to "diagnostic, preventive, corrective, and curative services and supplies essential thereto, provided by qualified medical and related personnel for conditions that cause suffering, endanger life, result in illness or infirmity, interfere with capacity for normal activity including employment, or for conditions which may develop into some significant handicap. . . ." (Stats. 1966, Second Ex. Sess. 1965, ch. 4, p. 112.)

In 1975 this scheme was overlaid with a provision saying that benefits are limited to listed federal mandatory and optional categories of care and services, most of which are qualified by the clause "subject to utilization controls." (See Welf. & Inst. Code, §§ 14131, 14132.) The utilization controls are set out in section 14133. In pertinent part they require prior authorization for some services and subsequent audits for all services with coverage contingent upon a determination that the service is medically necessary. No statutory definition of medical necessity was provided initially.

In 1982 section 14133.3 was enacted saying that requests for prior authorization must be supported by documentation that "the requested services are medically necessary to protect life or prevent significant disability . . . ." The statute also directed that utilization controls be developed for all care and services implementing the same limitation. This enactment gave rise to this litigation.

In 1985 Welfare and Institutions Code section 14059.5 was enacted and section 14133.3 was amended. Section 14059.5 says: "A service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain." As amended, section 14133.3 substituted the section 14059.5 standard of medical necessity for the prior formulation "necessary to protect life, or prevent significant disability . . . ." At issue is the present statute, since the order under review is injunctive in nature. Hence, it is necessary to address plaintiffs' present claim that sections 14059.5 and 14133.3 conflict with federal law.

The problem of the constraint of medical necessity and the flexibility accorded states to limit the scope of Medicaid benefits is not novel.[1] The only controlling authority addressing the topic is *Beal* v. *Doe, supra,* 432 U.S. 438 [53 L.Ed.2d 464]. In *Beal,* Pennsylvania had promulgated a regulation limiting Medicaid coverage of abortion to cases where the procedure was certified by a physician to be medically necessary. (*Id.,* at p. 441 [53 L.Ed.2d at p. 470].) The issue tendered was whether the regulation conflicted with the federal Medicaid statute in denying coverage for certain abortions; specifically, in denying coverage where there was no physician's certification that continuance of the pregnancy might threaten the health of the mother (in any manner other than the generic threat that inhers in termination of pregnancy by childbirth). (*Id.,* at pp. 441, 445 [53 L.Ed.2d at pp. 470, 472].) The holding in *Beal* is that such a regulation is not invalid. (*Id.,* at p. 447 [53 L.Ed.2d at p. 474].)

The *Beal* opinion acknowledges the requirement that states provide financial assistance for the care and services listed as mandatory in title XIX. (*Id.,* 432 U.S. at p. 444 [53 L.Ed.2d at p. 471].) "Although serious statutory questions might be presented if a state Medicaid plan excluded necessary

---

[1] One line of case law implicitly or explicitly assumes that all medically necessary services must be provided. (See, e.g., *Pinneke* v. *Preisser* (8th Cir. 1980) 623 F.2d 546, 548, fn. 2, medical necessity is the standard for mandatory coverage.) Another line of case law assumes that the state is free to impose limitations on coverage which are premised on the perceived degree of medical necessity. (E.g., *Curtis* v. *Taylor* (5th Cir. 1980) 625 F.2d 645, 652.) In both lines the reasoning about the statutory meaning of the medical necessity is contaminated and confused by extraneous threads such as the role of the physician in the adjudicative question of existence of medical necessity and "discrimination" against particular illnesses prohibited under federal regulations. The closest case to this is *Medical Soc. of State of N.Y.* v. *TOIA* (2d Cir. 1977) 560 F.2d 535, but that case unaccountably treats the statutory reading question as one of fact and remands for trial. The law reviews are of some help but more for marshalling authority than resolution of the problem. (See Gosfield, *Medical Necessity In Medicare and Medicaid: The Implications of Professional Standards Review Organizations* (1978) 51 Temple L. Q. 229 (hereafter *Medical Necessity*); Note, *State Restrictions on Medicaid Coverage of Medically Necessary Services* (1978) 78 Colum.L.Rev. 1491.) Since neither the case law nor secondary authorities provide an appropriate analytic base I merely note them here as an aside.

medical treatment from its coverage, it is hardly inconsistent with the objectives of the Act for a State to refuse to fund *unnecessary*—though perhaps desirable—medical services." (*Id.*, at pp. 444-445 [53 L.Ed.2d at p. 472].) The *Beal* court found that termination of pregnancy by abortion, absent an unusual threat to the health of the mother, is not medically necessary.

What is the nature of the serious federal statutory questions presented if a state excludes necessary medical treatment from Medicaid coverage? The obvious problem is that the exclusion of necessary medical treatment would conflict with the *minimum* benefit requirements of title XIX. States may deny coverage within the mandatory categories if the care and services are not medically necessary. If states are also free to define medical necessity based upon the degree of urgency and their fiscal inclinations, the minimum benefit requirement provision is rendered a nullity.

Strictly speaking, necessity is an either/or concept. "A little bit necessary," like "a little bit pregnant," is an oxymoron. Implicit in the·*Beal* opinion and in the federal statutory concept of medical necessity is that medical procedures are either medically necessary or not medically necessary. As appears, the meaning of the federal statutory concept "medically necessary" is fixed. Hence a state cannot redefine medical necessity according to its views of urgency of the need for medical assistance if the result is to deny mandatory coverage of procedures which are medically necessary within the meaning of the federal act.

The concept of medical necessity appears in various places in title XIX. As related, the declaration of purpose defines eligibility in part on inability "to meet the costs of necessary medical services . . . ." (42 U.S.C. § 1396.) A later reference to this provision bears directly on the flexibility accorded to participating states to shape the content of their Medicaid programs. A state plan must "include reasonable standards . . . for determining . . . the extent of medical assistance under the plan which (A) are consistent with the objectives of [title XIX] . . . ." (42 U.S.C. § 1396a(a)(17).) Hence, a state standard which denies coverage for "necessary medical services" within the mandatory service categories is not within the broad discretion conferred on states. (Cf. *Pinneke* v. *Preisser, supra,* 623 F.2d at p. 548; also *Beal, supra,* 432 U.S. at p. 444 [53 L.Ed.2d at p. 472].)

The concept of medical necessity also appears in title XIX in provisions which advert to the utilization review provisions of title XVIII. (See 42 U.S.C. §§ 1396a(30) and 1396b(i)(4) incorporating by reference the term "medical necessity" in 42 U.S.C. § 1395x(k).) This explicit nexus shows that the content of the concept of medical necessity is identical under both

titles. (See generally Gosfield, *Medical Necessity, supra,* 51 Temple L.Q. at pp. 238-243.) That conclusion is reinforced by the enactment of both titles in their modern guise in the same bill in the Social Security Act amendments of 1965. This implication in turn is strengthened by the legislative history indicating that the two titles are part of a "coordinated approach." (See *Roe* v. *Norton* (2nd Cir. 1975) 522 F.2d 928, 940, conc. and dis. opn. of Mulligan, J.)

There is no express definition of the term "medical necessity" in title XIX. However, that does not mean that there is no statutory content to the term. (See *Pinneke* v. *Preisser, supra,* 623 F.2d at p. 548.) There is a candidate for a statutory definition of medical necessity in title XVIII. Under this title coverage is ordinarily denied unless the medical procedure is "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member . . . ." (42 U.S.C. § 1395y(a)(1)(A).) This provision has been consistently equated with the term medical necessity in federal medicare case law. (See, e.g., *Hultzman* v. *Weinberger* (3d Cir. 1974) 495 F.2d 1276, 1282; *Mount Sinai Hospital, Inc.* v. *Weinberger* (5th Cir. 1975) 517 F.2d 329, 335.) As I have shown, the title XIX provisions advert to the utilization review provisions of title XVIII so as to equate the meaning of "medical necessity" under both titles.

*Beal, supra,* 432 U.S. 438, implies that the content of the term medical necessity is determinate and determinable as a matter of federal law. Indeed, the fundamental precept of law, consistency, impels the conclusion that medical necessity cannot have a different meaning in different states. The *Beal* opinion suggests that medical necessity is a medical judgment that the measure is reasonable to safeguard or improve the health of the patient. (See *Beal, supra,* 432 U.S. at p. 441, fn. 3 [53 L.Ed.2d at p. 470].) This is entirely consistent with employment of 42 United States Code section 1395y(a)(1)(A) as the federal definition of medical necessity. Moreover, this definition accounts for the holding in *Beal* that "non-therapeutic" abortion is not required to be covered by a state Medicaid plan. A normal pregnancy is not in ordinary usage called an injury or illness nor does a "non-therapeutic" abortion improve the functioning of a malformed body member. (Cf. *Geduldig* v. *Aiello* (1974) 417 U.S. 484, 496, fn. 20 [41 L.Ed.2d 256, 264-265, 94 S.Ct. 2485].)

Use of this definition also comports with the usage of "medically necessary" I would expect in ordinary speech. One would say a care or service was medically necessary if undertaken pursuant to a physician's professional advice to prevent, cure, or alleviate illness, injury, or malformation of a body member.

Any narrower definition of medical necessity would have to be premised on the perception that the phrase is a technical term. But there is no textual or contextual indication that any special or technical meaning is appropriate. Moreover, any such construction would rebuff the canon that remedial legislation such as the Medicaid Act should be construed liberally. (See, e.g., *Brooks* v. *Smith* (Me. 1976) 356 A.2d 723, 729.) Under this canon an ambiguous term is ordinarily construed in favor of coverage for the recipient. (See, e.g., *In-Home Supportive Services* v. *Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 720, 733 [199 Cal.Rptr. 697].)

California's preferred definition of medical necessity challenged in this case is medical services "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain." Under Welfare and Institutions Code sections 14059.5 and 14133.3, this definition is injected into the system of utilization controls and is applied to all services, including those services made mandatory by title XIX. This definition is in facial conflict with federal law insofar as it would deny coverage for "medically necessary" care and services (as defined under federal law) for mandatory categories of care and service under the Medicaid Act. Medical care and services reasonably recommended to diagnose, cure, or prevent minor illness, to improve the functioning of a malformed body member regardless if it amounts to a significant disability, or to alleviate moderate pain or minor discomfort which attend injury or illness must be provided within the mandatory service categories. Hence, language in California's statutes which would exclude coverage of such care and services is invalid on the ground of federal supremacy.

### B

I am not swayed from this conclusion by the consideration that the Department of Health and Human Services advocates the contrary position. The question is one of interpretation of the federal statute.[2] As to such

---

[2]The Secretary of Health and Human Services is given general authority to promulgate rules and regulations regarding Medicaid that are "not inconsistent" with the statute and necessary to the efficient administration of the functions with which he is charged under the statute. (42 U.S.C. § 1302.) As to certain matters the secretary is given substantive authority to prescribe standards, e.g., standards for income and resources to be considered available to recipients under 42 United States Code section 1396a(a)(17)(B). There is no indication in the statute that the secretary has been assigned substantive authority to prescribe standards regarding the content of minimum benefit requirements of the mandatory categories of care and services under section 1396a(a)(10). Hence, even if the secretary had promulgated a regulation purporting to govern such matters and inconsistent with my reading of the statute, the regulation would be subject to review as an administrative interpretation. It would not be accorded the special deference accorded administrative rules promulgated under a grant of delegated legislative authority. (See 2 Davis, Administrative Law Treatise (2d ed. 1979) §§ 7:8, 7:13.)

questions the view of the responsible administrative agency is not binding upon the court. (See, e.g., *Batterton v. Francis* (1977) 432 U.S. 416, 425, fn. 9 [53 L.Ed.2d 448, 456, 97 S.Ct. 2399]; 2 Davis, Administrative Law Treatise, *supra,* § 7:13.) The degree of weight accorded the agency view varies based upon the confidence of the court in its own reading of the statute, the pertinence of expertise of the agency to the matter at hand, and various technical considerations such as whether the agency view is a contemporaneous construction, of long duration, has been consistently maintained, or if embedded in a regulation, has been impliedly endorsed by statutory reenactment. (See *ibid.*)

Here, the opposition of the Department of Health and Human Services is an insufficient consideration to dissuade me from my announced reading of the Medicaid statute. Although the statutory question requires a complicated analysis I have a high degree of confidence that the analysis is correct. The department offers no legal argument which shakes that confidence into the realm of significant doubt. The department presents no reasoned explanation of the manner in which esoteric questions within its special administrative expertise may be clouding my view. Nor is there any indication that any of the potential technical considerations mentioned above strongly commend deference to the department's view in this case.

## C

The language in Welfare and Institutions Code sections 14095.5 and 14133.3 which would produce the unlawful effect in conflict of federal law is invalid and must be stricken. (See *People's Advocate, Inc.* v. *Superior Court* (1986) 181 Cal.App.3d 316, 330-334 [226 Cal.Rptr. 640].) But this language is the core and only substance of these challenged statutes. The provisions should be stricken in their entirety on the ground that no mechanical severence of invalid language is possible. A court is not at liberty to rewrite the provisions, e.g., by inserting qualifications limiting their application to nonmandatory services under title XIX. (*Id.,* at p. 330, fn. 15.) Hence, it is not necessary to consider the other arguments concerning validity and invalidity of sections 14095.5 and 14133.3 tendered by the parties.

## III

The second main component of the writ would extinguish the prior authorization scheme under Welfare and Institutions Code section 14133. As best I can determine from the statement of decision, the trial court concluded that this scheme conflicts with title XIX on various grounds. The statement of decision suggests that section 14133 unlawfully limits coverage of services

that are medically necessary, that section 14133 conflicts with an implicit federal mandate that physicians decide whether a care or service is medically necessary, that because of fiscal constraints the prior authorization system operates with less staff than reasonably required to process requests for prior authorization, that the prior authorization system costs more than it saves, and that many drugs which are medically necessary are, to a substantial degree, unobtainable under the prior authorization system.

The first question is: What is the effect of the conclusions concerning the invalidity of Welfare and Institutions Code sections 14133.3 and 14059.5 on the rationale that section 14133 unlawfully limits Medi-Cal coverage of care and services that are medically necessary? As related, section 14133 was enacted without an explicit statutory definition of the term "medical necessity." Section 14133.3 and later section 14059.5 were subsequently enacted defining medical necessity implicitly initially and explicitly thereafter. These subsequent enactments were viewed as cost-saving measures. Such savings could only have stemmed from a contraction of the coverage under Medi-Cal, i.e., from a constriction of the term "medical necessity." Hence, section 14133.3 and later section 14059.5 must be viewed as implied amendments of section 14133. As such, when the amendments are stricken, the meaning of medical necessity in section 14133 is returned to its original unconstricted usage. "Generally stated, the rule is that when discrimination or unconstitutionality results from a statutory amendment, as is the case here, it is the amendment which is invalid and not the original portions of the statute." (*Miller* v. *Union Bank & Trust Co.* (1936) 7 Cal.2d 31, 36 [59 P.2d 1024].)

With the unlawful gloss of sections 14133.3 and 14059.5 removed, I would construe the meaning of "medical necessity" in section 14133 as identical with the previously discussed definition of that term under the federal law of title XIX. Having so construed section 14133 I discern no conflict between it and the federal law mandate concerning minimal requirements for services under the Medicaid Act. Hence, none of my reasoning concerning invalidity of sections 14133.3 and 14059.5 supports a finding of invalidity of section 14133. To the extent that the component of the proposed writ addressed to section 14133, subdivision (a), is based upon that rationale, it is unwarranted. The trial court's concern about unavailability of medically necessary drugs is also extinguished by the invalidation of sections 14133.3 and 14059.5.

These conclusions call into question the entire judgment insofar as it extends to matters beyond the invalidity of section 14133.3 and section 14059.5. The nature of the statement of decision is such that I cannot disentangle the findings of the trial court and determine whether any of the

other restraints of the proposed writ would have been imposed upon the state if the "medical necessity" problem had been correctly analyzed and confined. As to the restraint on the enforcement or implementation of section 14133, none of the other reasons given in the statement of decision tenders a challenge to that statute's validity on its face. At most these reasons pertain to possible conflict with federal law in the manner in which the statute has been applied, i.e., in the administrative scheme established under the statute.

The appropriate resolution is to overturn the remainder of the judgment and return the matter to the trial court for reconsideration in view of this reasoning. That I would do. That tenders several other concerns.

## IV

A principal concern of the trial court was the perceived mandate of title XIX that the individual physician determine the medical necessity of services provided to Medi-Cal recipients. The trial court's perception of the scope of this mandate may be somewhat overblown. I find no intimation in the federal law that the judgments of individual physicians concerning the medical necessity of services are not subject to review. Regardless of the hope that the practice of the art of medicine not be unduly hindered by heavy-handed bureaucratic second-guessing, the federal law expressly mandates utilization controls which encompass review to safeguard against unnecessary utilization of services. (42 U.S.C. § 1396a(a)(30).) Moreover, as to care and services within the optional categories of title XIX, it is not immediately apparent why a state should not be able (by lawful means) to limit its degree of participation to coverage of circumstances more grave than all those encompassed by the federal medical-necessity standard.

As to care and services that a state has lawfully declined to cover there is nothing inherently improper in denying reimbursement via an administrative prior authorization scheme. Even as to those categories of care and services where medical necessity is a federal criterion of mandatory coverage, there is no intrinsic impropriety in such screening. Ultimately, questions of medical necessity are questions of public law and adjudicative fact. The deference granted to the physician pertains to expertise on the adjudicative fact component. But even that deference is not to the idiosyncratic opinion of individual physician, rather it is to the professional judgment of that physician, subject to and constrained by professional norms of justification and the underlying standard of public law.

As to the claim that the administrative costs of such a scheme outweigh the actual savings in lawful denial of noncovered care and services, I am unpersuaded. The argument is certainly not novel. (See tenBroek, *Califor-*

*nia's New Medical Care Law and Program* (1958) 46 Cal.L.Rev. 558, 579-583.) Here the evidence of costs and benefits is very sketchy and does not account for possible savings in deterrence of inappropriate utilization of care and services. Moreover, this is the sort of argument that should be addressed to the lawmaker. (See *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 372-374 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233].)

V

This is not to say, however, that a prior authorization scheme may not in practice run afoul of federal law. The state cannot employ a prior authorization scheme which has the purpose or effect of noncompliance with federal substantive mandates. If, as a practical matter, an administrative prior authorization scheme unreasonably results in denial of covered care and services to eligible recipients that scheme is in conflict with federal law. For example, a state could not require prior authorization if it refused to provide adequate personnel to allow the scheme to function in a manner consistent with timely provision of such care and services.

If the inadequate quantity or quality of staff for a prior authorization scheme resulted in unreasonable delays or an unreasonably high level of incorrect denial of authorization this could present a violation of federal law. To choose an extreme example, authorization for care and services could be regularly delayed until illnesses for which they are medically necessary had run their course. This would raise a substantial question of compliance with federal mandates. (See, e.g., 42 U.S.C. § 1396a(a)(10) discussed, *ante*, part II, pp. 990-991; 42 U.S.C. § 1396a(a)(19) [a state plan must assure that covered care and services will be provided, in a manner consistent with simplicity of administration and the best interests of recipients]; 42 U.S.C. § 1396a(a)(30) [utilization review procedures must be consistent with efficiency, economy, and quality of care].)

Here the original statement of decision contains evidence that may raise serious federal questions. The state admitted that "Because of fiscal shortages, [the state is] forced to operate with less than the full complement of staff reasonably required to process [requests for prior authorization]." The offices which can grant prior authorization are closed weekends, holidays, and evenings. Processing of prior authorization by mail often takes as long as nine to thirteen days. There was evidence that obtaining prior authorization approval by telephone can be a protracted, frustrating ordeal. It is difficult to obtain an open line to prior authorization offices, the transcribers who take incoming calls are unfamiliar with medical terminology, and delay in the process leads to detriment to patients' health.

I imply no view on the question is there sufficient evidence to condemn the state's administrative scheme purporting to implement section 14133. In any event, such a finding would not warrant a writ commanding that no implementation or enforcement of section 14133 occur. At most the relief warranted would be a command to cease requiring prior authorization until the defects which raised substantial federal compliance questions were cured. As related, I cannot discern what the unalloyed findings of the trial court would have been regarding such compliance questions. Moreover, changes in the situation as a result of an invalidation of sections 14133.3 and 14059.5 and changes attributable to the passage of time and the possible effects of other unknown developments would render it unwise to attempt to reform the judgment at the appellate level as pertains to aspects beyond the invalidation of those statutes.

I would affirm the judgment insofar as it orders issuance of a peremptory writ commanding the state not to implement or enforce Welfare and Institutions Code section 14133.5 and would modify it to include Welfare and Institutions Code section 14059.5 within this proscription and as so modified affirm it. In all other respects I would reverse the judgment for further proceedings.

A petition for a rehearing was denied January 7, 1987, and the petition of plaintiffs and appellants for review by the Supreme Court was denied April 2, 1987. Mosk, J., Broussard, J., and Kaufman, J., were of the opinion that the petition should be granted.