[Civ. No. 19054. Third Dist. Apr. 9, 1981.]

ALTA BATES HOSPITAL et al., Plaintiffs and Appellants, v. JEROME A. LACKNER, as Director, etc., et al., Defendants and Appellants.

COUNSEL

Hanson, Bridgett, Marcus, Vlahos & Stromberg, John J. Vlahos, Paul A. Gordon and Robert L. Rusky for Plaintiffs and Appellants.

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, and Robert F. Tyler, Deputy Attorney General, for Defendants and Appellants.

OPINION

**REGAN, Acting P. J.**—Plaintiffs filed a class action in October 1973 for declaratory relief and damages arising out of a directive issued in December 1970 by the then Director of the State Department of Health (director) which reduced by 10 percent reimbursements paid to hospitals for outpatient services rendered under the Medi-Cal program, which directive remained in effect until July 1971. The complaint sought a declaration by the trial court that the directive and the provisions of law under which it was issued were invalid, void and unenforceable. Damages were also sought for each member of the class according to proof, plus interest and attorney's fees.[1]

---

[1]It is agreed by the parties that approximately 580 to 600 hospitals are involved.

Plaintiffs pled the directive issued by the director (which affected the "class"—consisting of all acute care hospitals participating in Medi-Cal) was in legal effect a "regulation" which was invalid and void because it violated the California Administrative Procedure Act with respect to notice and hearing. It was also alleged that all *named* plaintiffs in the class (save one) had filed claims with the State Board of Control (board) as required by law as a condition precedent to bringing the action; that each claim was denied; and that it would have been idle, useless and an unnecessary burden for the remaining unnamed members of the class to have filed claims with the board.

In their answer, in addition to denying allegations (except those concerning the failure of all class members to present claims to the board), defendants asserted five affirmative defenses: (1) that plaintiffs had failed to exhaust the administrative remedy contained in Government Code section 11426 (which allows a petition to a state agency to repeal a regulation); (2) that plaintiffs were guilty of laches arising from the greater difficulty caused to defendants in compiling evidence to rebut the substantive allegations of the complaint and/or to compute any damage award; (3) that any money damage award to the named and unnamed plaintiffs was barred by their failure to exhaust the administrative claims procedures contained in Welfare and Institutions Code section 14104.5, title 22, California Administrative Code, section 51015, and Government Code section 910 et seq. (all relating to the government tort claims act, requiring presentation to the board of control); (4) as to the second cause of action only, that defendants would be unable to pay any money damage award due to the fact that any award could only come from the previously expended program allocations for fiscal 1970-1971; and (5) also as to the second cause of action only, that plaintiffs were not entitled to declaratory relief as to the 10 percent cutback, in that said cutback was rescinded June 30, 1971, and this action became moot.

The action was certified as a class action by the trial court on December 29, 1975. On May 2, 1977, plaintiffs moved for partial summary judgment on the grounds there were no triable issues of fact relating to: (1) the legality of the 10 percent cutback (i.e. no necessity as a matter of law to comply with the Cal. Admin. Procedure Act); (2) the inapplicability of Government Code section 11426 as a possible bar to relief (one of defendants' affirmative defenses); and (3) the inapplicability of Welfare and Institutions Code section 14104.5, title 22, California Administrative Code, section 51015, and Government Code

section 910 et seq. (filing with the board of control) as a bar to relief as to those members of the class who had not filed claims with the defendants' fiscal intermediaries (i.e. Blue Cross)[2] and the State Board of Control.

On September 21, 1977, the trial court granted in part plaintiffs' motion for partial summary judgment. The court found that the 10 percent cutback was invalid in that defendants had not complied with the requirements of the Administrative Procedure Act. The court denied plaintiffs' motion for summary judgment as to defendants' first and third affirmative defenses (claims statutes—see *ante*). However, the court (on plaintiffs' motion) reconsidered its order as to the first and third defenses and ruled, on December 20, 1977, that these defenses were without merit as a matter of law and granted summary judgment as to them.

On February 3, 1978, plaintiffs moved for partial summary judgment as to defendants' second (laches—see *ante*) and fourth (no funds—see *ante*) affirmative defenses. This motion was granted on February 16, 1978.

On July 6, 1978, plaintiffs moved for partial summary judgment as to damages. This motion was denied on July 20, 1978.

On January 9, 1979, defendants moved the court to reconsider that part of its order of December 20, 1977, which ruled that defendants' third affirmative defense (claims statute—presentation to board of control) was without merit as a matter of law, and asked the court for an order allowing it to be litigated at trial. The trial court acceded, in effect reversed itself, and denied plaintiffs' earlier motion for partial summary judgment as to the third affirmative defense—thus allowing that defense to be raised later at trial.

After a two-day trial before the court without a jury, the court rendered its intended decision on May 3, 1979, partially in favor of defendants and partially in favor of plaintiffs. The salient points of that decision, insofar as this appeal is concerned, are (1) the various unnamed members of the plaintiff class had failed to comply with the requirements of the applicable governmental claims procedures (Welf. & Inst. Code, § 14104.5, and Gov. Code, § 910 et seq.); (2) the 20

---

[2] See Welfare and Institutions Code, section 14000.3.

claims of the individually named plaintiffs did not, either individually or cumulatively "substantially comply" with the requirements of a "class claim"; and (3) defendants were not estopped from asserting these facts as a bar as to money damage relief as to those plaintiffs who had not complied with the board of control claims procedure spelled out in the Government Code. As to damages, the trial court ruled that the various hospitals (except those barred by noncompliance with the claims statutes) were entitled to damages consistent with defendants' answers to plaintiffs first set of supplemental interrogatories, except for those hospitals whose damages were shown on the recomputation rendered between the time defendants submitted their answers to the interrogatories and the time of trial. The court awarded interest, commencing the 61st day subsequent to March 7, 1971 (the median date of the time period encompassing the 10 percent cutback), at the rate of 7 percent.

At request of plaintiffs, the defendants submitted a proposed judgment and proposed findings of fact and conclusions of law on May 24, 1979. After various objections, hearings, and written comments were had, the court adopted its findings of fact and conclusions of law in conformance with its decision and entered judgment on August 1, 1979.[3] This appeal and cross-appeal followed.

Defendants' principal contention as cross-appellants is that the trial court's fundamental, underlying ruling which invalidated the 10 percent cutback was erroneous. Since we agree with this contention, we shall reverse the judgment. We need not and do not reach the various other contentions made by either plaintiffs or defendants. To do so would be unnecessary at best and at worst would be obiter dictum which could prejudice litigants in other actions. (See 5 Cal.Jur.3d, Appellate Review, § 487, pp. 130-132; *Young* v. *Three for One Oil Royalties* (1934) 1 Cal.2d 639, 647-648 [36 P.2d 1065]; *Stockton Theatres, Inc.* v. *Palermo* (1956) 47 Cal.2d 469, 474 [304 P.2d 7].)

█ As previously mentioned, one of the grounds upon which plaintiffs moved for partial summary judgment was that the 10 percent

---

[3]The trial court found, inter alia, that the agreement with the director (purportedly waiving the claim requirements) was ambiguous and ultra vires and awarded damages ($179,560.60, plus interest) only to the 20 class members who actually filed the separate representative claims and not to the other members of the class. Although finding that over $1.5 million had been unlawfully withheld by defendants from the class of hospitals, the trial court ruled that the other approximately 580 to 600 hospitals could not recover.

cutback directive was a "regulation" within the meaning of Government Code section 11371, subdivision (b) (now § 11342, subd. (b)), and therefore fell within the requirements of the statutes governing the adoption of regulations under the Administrative Procedure Act (i.e., notice and hearing), which were not complied with. As to this ground, plaintiffs were successful, and the trial court entered partial summary judgment against defendants as to this issue. This order, which allowed the case to proceed as to other issues, was erroneous. As we shall point out, the 10 percent cutback was valid as a matter of law, and the trial court should have so ruled.

The director acted pursuant to Welfare and Institutions Code, section 14120, subdivisions (c) and (f). At the time he made the 10 percent cutback in December 1970, that section read, in pertinent part, as follows: "(c) At any time during the fiscal year, if the director has reason to believe that the total cost of the program will exceed available funds, he may, first modify the method or amount of payment for services, provided that no amount shall be reduced more than 10 percent and no modification will conflict with federal law. If such modification is not sufficient to bring the program within available funds, the director may postpone elective services. Such postponement of elective services shall be accomplished by changing the standards for approval of requests for prior authorizations. Such changes shall be designed to insure that those recipients most in need of elective services receive them first within the funds available, but that no particular service is completely eliminated."

"(f) Before any of the above actions are taken by the director, he shall consult with representatives of concerned provider groups." (Stats. 1968, ch. 1241, § 4, p. 2350.)[4]

The history of section 14120 is significant. The Legislature, through various enactments, initially gave the director wide discretion over Medi-Cal eligibility. Exercise of these controls was first attempted by the director in September 1967, when it was estimated that the Medi-Cal program would again overrun its budget by one-third (i.e., estimated expenditures of $811 million as compared to the budgeted $600 million). The director exercised a portion, but not all, of his powers and promulgated various emergency regulations regarding the scope of

---

[4]Although since amended, the above provisions read substantially the same today.

minimum coverage. These emergency regulations were subsequently overturned in *Morris v. Williams* (1967) 67 Cal.2d 733, 744 [63 Cal.Rptr. 689, 433 P.2d 697]. The extent of the director's discretion in meeting a fiscal emergency became unclear. In commenting upon the situation, an Assembly committee assigned to study the Medi-Cal program came to the conclusion that it was not necessary or desirable for the director to make major changes in the program by picking and choosing among the services to be curtailed in the face of a fiscal emergency. The committee proposed instead that the Legislature should determine the classes of persons to be covered, the services to be provided and the cost thereof, and that the director's discretion should be limited to making adjustments in reimbursement rates and the postponement of nonessential services to allow for minor increases in the program costs. (Cal. Leg., Com. on Pub. Health, A Preliminary Report on Medi-Cal (1968) pp. 29-30.)

Section 14120, subdivision (c), was passed shortly after the publication of this report. (Stats. 1968, ch. 1241, § 4, p. 2350.) It gave the director the means of preventing future cost overruns, whenever he had "reason to believe" such would occur in the Medi-Cal program by first modifying the method or amount of payment for services provided, and then, should that modification not be sufficient to bring the program within its available funds, by postponing elective services. The exercise of the director's powers under section 14120, subdivision (c), was *mandatory* whenever during a fiscal year the total amounts actually paid by the program exceeded the amounts scheduled to be paid by that date by 10 percent. (Welf. & Inst. Code, § 14120, subd. (d).)

By its very nature, section 14120 is useless if its mechanism is not utilized *as soon as* the fiscal emergency is discovered. Any delay in response means that the corrective measures must be proportionately harsher to be effective. The longer the delay the more likely it becomes the initial action contained in section 14120, subdivision (c), the across-the-board reduction in reimbursement rates of up to 10 percent, will not be effective and resort must be had to the more drastic secondary powers contained in section 14120, subdivision (c), concerning a postponement and possible reduction in elective services to recipients. This secondary response of course encompasses not only the fiscal interests of the state, as does the first, but also affects the vital interests of Medi-Cal beneficiaries in receiving "main stream" medical care for their total medical needs.

As is obvious from the language of section 14120, subdivision (c), a 10 percent cutback is triggered by a unitary finding that the director has reason to believe a fiscal cost overrun will occur before the end of the fiscal year. But in such a situation, action cannot be taken without consultation with concerned health services provider groups. (§ 14120, subd. (f).)

Of singular importance as to legislative intent is the Legislature's wording of the standard to be utilized in reaching the conclusion which triggers the process. Inherent in this language is the inescapable conclusion the Legislature intended the level of factual proof to be lower than that normally intended to apply to administrative decisions contemplated by the Administrative Procedure Act, for the concept of "reason to believe" denotes a more subjective choice. Under section 14120, subdivision (c), the director does not necessarily have to believe a fiscal crisis is more likely than not to occur. (Cf. *California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637, 650-651 [106 Cal.Rptr. 555], where under different facts the burden of proof devolved upon the director to justify his finding of fiscal deficiency and emergency under the Administrative Procedure Act "emergency regulation" provisions.) Here, the director has only to have a reasonable basis for his "reason to believe."

One of the main themes advanced by plaintiffs was that the director, had he complied with the Administrative Procedure Act, would have had to receive public input and expose the basis for his decision before undertaking it. Aside from the delays which this procedure would entail, it is apparent that since the Legislature did not spell out that the Administrative Procedure Act should be followed, the legislative body recognized that the director is apt to be uniquely in possession of the only factual data pertaining to the problem. (See § 14120, subds. (a) and (b), requiring the director to keep a monthly schedule of anticipated and actual payments for categories of Medi-Cal services.) Moreover, we emphasize the importance of subdivision (f) of section 14120, requiring consultations with representatives of concerned provider groups.

The Administrative Procedure Act is a general law containing general provisions applicable, inter alia, to the promulgation of regulations by administrative agencies. However, Welfare and Institutions Code section 14120, subdivision (c), is a specific provision relating to a particular narrow subject, and, as such, under well-established principles of statutory construction, is to be treated as an exception to or as exempt from the general provisions. (*Long Beach City School Dist.* v.

*Payne* (1933) 219 Cal. 598, 605 [28 P.2d 663]; *People* v. *Wood* (1958) 161 Cal.App.2d 24, 29 [325 P.2d 1014]; 58 Cal.Jur.3d, Statutes, §§ 107, 109, pp. 482-483, 488-491.)

As a practical matter, were we to uphold the trial court's ruling that a directive such as made in this case by the director could only be made as a regulation through the procedural mechanics of the Administrative Procedure Act, we would effectively eviscerate section 14120, subdivision (c). That section is designed to allow the director, who is uniquely in possession of the factual data through possession of records and statistics, to make the necessary fiscal determinations and projections which call for action under the section. The Legislature obviously recognized this when it provided the director with the tool of section 14120, subdivision (c), and did not specify that his use of that tool was to be slowed by the relatively cumbersome and, in this case, unnecessary procedures of the Administrative Procedure Act.[5]

The judgment is reversed. Defendants shall recover their costs on appeal.

Evans, J., and Blease, J., concurred.

A petition for a rehearing was denied May 8, 1981, and the petition of plaintiffs and appellants for a hearing by the Supreme Court was denied June 24, 1981.

---

[5]It cannot be successfully argued that long delay could be minimized by utilization of the "emergency regulation" procedures set forth in the Administrative Procedure Act, specifically in former Government Code section 11422 (now § 11346.2). Under that procedure, it would be necessary to draft formal regulations, prepare cost reports, submit them to the Department of Finance, have finance review and then file and approve them in writing with the Secretary of State and the Legislature. (Welf. & Inst. Code, § 14105, subd. (a).) Moreover, affected parties are given rights under Welfare and Institutions Code section 14120, subdivision (c), they would not have under the Administrative Procedure Act, in that, under section 14120, subdivisions (c) and (f), providers are consulted before the action is undertaken, whereas an emergency regulation requires no such prior notice and consultation.